THOMAS WARNER, JR., AND JEAN SPRAGUE, DOING BUSINESS UNDER THE FICTITIOUS FIRM NAME OF WARNER WELDED PRODUCTS, A LIMITED PARTNERSHIP, PETITIONERS, *v.* WAR CONTRACTS PRICE ADJUSTMENT BOARD, RESPONDENT.

Docket No. 582–R. Promulgated June 28, 1950.

---

*Manuel Ruiz, Jr., Esq.,* for the petitioners.
*John F. Wolf, Esq.,* and *James D. Lynch, Esq.,* for the respondent.

1322

1324

1326

**OPINION.**

ARNOLD, *Judge*: Petitioner [2] challenges not only our jurisdiction to redetermine the excessive profits, if any, but also the respondent's right to determine excessive profits in the first instance. It contends that section 403 (c) (6), Renegotiation Act of 1943, fixes the jurisdictional amount at a minimum of $500,000, and that its renegotiable

---

[2] The term "petitioner," as used herein, includes the individual partners and their firm name of Warner Welded Products.

sales and all other income for the fiscal period ended December 31, 1944, was less than $250,000. Respondent concedes that unless "common control" existed between the partnership and the corporation, as provided by section 403 (c) (6), Renegotiation Act of 1943, there is no jurisdiction in this Court or the respondent. The pertinent provisions of the section appear in the margin.[3]

Respondent's regulations as to common control[4] provide in part as follows:

348.4 Tests of "Control". In determining whether the contractor controls or is controlled by or under common control with another person, the following principles should be followed:

> \*        \*        \*        \*        \*        \*        \*

(5) Other cases: Actual control is a question of fact. Whenever it is believed that actual control exists even though the foregoing conditions are not fulfilled, the matter may be determined by the Department or Service conducting the renegotiation.

Petitioner's objection to the common control theory is that if the incomes of the two entities are to be combined under this theory, then aggregate costs should also be combined in order to determine combined aggregate profits. It is urged that respondent refused to renegotiate on an over-all aggregate basis, which petitioner says is contrary to the mandatory requirements of the Renegotiation Act of 1943, and insisted on and did renegotiate the corporation and the partnership separately. Petitioner insists that when respondent isolates its income from the corporation's the jurisdictional floor becomes operative and neither respondent nor this Court can renegotiate its war contracts.

Our concern is the proper interpretation of the statutory language "under common control" when applied to the present facts. In other words, were the corporation and the partnership under common control? This is a factual question, the determination of which depends upon all the facts and circumstances of record. *Rochester Telephone Corporation* v. *United States*, 307 U. S. 125. Our findings show that the Warners, father, son and daughter, owned the entire proprietary interests in both business enterprises. Petitioner stresses the father's stock control of the corporation, by virtue of the voting trust agreement, and the son's absolute control of the partnership under the partnership agreement with his sister, as precluding common control. The

---

[3] This subsection [6] shall be applicable to all contracts and subcontracts, to the extent of amounts received or accrued thereunder in any fiscal year ending after June 30, 1943, \* \* \* unless \* \* \* (B) the aggregate of the amounts received or accrued in such fiscal year by the contractor or subcontractor and all persons under the control of or controlling or under common control with the contractor or subcontractor, under contracts with the Departments and subcontracts (\* \* \*) do not exceed $500,000 \* \* \*. If such fiscal year is a fractional part of twelve months, the $500,000 amount \* \* \* shall be reduced to the same fractional part thereof for the purposes of this paragraph.

[4] Renegotiation Manuals for fiscal years ending after June 30, 1943.

son's directorship in the corporation, says petitioner, gave him no control, as there were two other directors, nor did his duties as general manager of the corporation give him control, since the father decided all policy questions. Actually, says petitioner, the son was an employee of the corporation, just as any other general manager is an employee of his firm.

Several answers might be made to petitioner's contentions, but we point out here that, while the father held voting control under the trust, the son and daughter were the beneficial owners of 80 per cent of the corporate stock and the father, as trustee, was bound to protect and respect their interests. The voting trust was strictly a family arrangement which could have been terminated at any time by common agreement among the members of the Warner family. The son's management of the corporate business was conceded on the witness stand, and the father's statements to the draft board regarding the major role played by the son in managing and operating the corporate business leave no doubt in our minds that the son controlled the business. If the father controlled and operated the business by deciding questions of policy which the son carried out as an employee of the corporation, that fact could have been substantiated by the father and perhaps by the sister, neither of whom appeared as a witness. The record indicates, and we are convinced, that the son controlled the operations of both enterprises, and we have accordingly found that the corporation and the partnership were under common control.

Our conclusion as to common control is abundantly supported by the manner in which the two businesses were conducted. Although separate entities, the partnership's purchases and sales were handled through the corporation. The latter purchased supplies and materials, provided the credit, kept the books, and maintained the inventory for both businesses. The brazing operations were definitely a part of the corporate operations prior to March 1, 1944. And this is true whether the corporation leased the brazing equipment from Thomas W. Warner, Jr., and a partner, other than his sister, or whether it operated as a department or a division within the corporate set-up. No good reason appears why the son and daughter could not have increased their investment in the corporation and enlarged its brazing operations. But, be that as it may, they elected to conduct their brazing business as a separate enterprise, and we must accept the facts as they are. Whatever the reason, the two enterprises operated and functioned as though they were one production unit under the control and guidance of Thomas W. Warner, Jr.

Recent decisions of this Court have involved the question of whether common control existed. In *Southland Steel Co.*, 13 T. C. 652, we had members of a family operating two separate businesses. The re-

spondent determined that the requisite control existed so that he could renegotiate Southland Steel even though the amount of its renegotiable sales was less than the jurisdictional amount of $500,000. We disap-- proved respondent's action and refused jurisdiction for the reason that the sister, who was the sole owner of Southland, had only a 3 to 4 per cent stock interest in Butane Equipment Co., and, although an officer and a director of Butane, took no part in its management and attended only one directors' meeting during a four-year period. By comparison the partners here owned an 80 per cent interest in the corporate business, which the son operated as general manager. See *Hug Co.* v. *War Contracts Price Adjustment Board*, 14 T. C. 621, where the president and general manager controlled the corporate stockholders and directors and caused the corporation to transfer war contracts to him individually for his personal advantage.

In *Moening* v. *War Contracts Price Adjustment Board*, 14 T. C., 589, we held that two partnerships owned equally by two general partners were under common control and that each partnership could be rene- gotiated, since their combined receipts exceeded the jurisdictional minimum of $500,000, although separately their receipts were less than $500,000. In the course of our opinion we used the following language, which appears singularly apt to the present circumstances:

The purpose of the "common control" clause in question is at least in part to prevent contractors from establishing, either in corporate or partnership form, a series of *ad hoc* business enterprises, each of which is to work on a phase of war contracts, in order to prevent the total receipts of the individual contractors derived from war contracts or subcontracts from reaching the jurisdictional minimum. See Senate Report No. 440, Part 2, 80th Cong., 2d sess., p. 11.

In view of the foregoing, we are of the opinion that the partnership and the corporation were under common control during the 10-month fiscal year, and that the renegotiable sales of petitioner and all persons under common control with it exceeded $500,000, the jurisdictional minimum. Respondent is therefore entitled to renegotiate the petitioner and determine whether it realized excessive profits.

Petitioner's next contention is that, if subject to renegotiation under the common control theory, respondent must, under the law, aggregate the income and costs of both business enterprises in order to determine whether the consolidated profits were excessive. The record indicates that the corporation was renegotiated separately, perhaps by a different technical service, and determined to have realized no excessive profits. It is argued, without supporting proof, that if income, costs, and profits of the two businesses were consolidated there would be no excessive profits; but that, due to the provisions of the Renegotiation Act, the corporation has no standing before this Court, since it has not been "aggrieved by an order of" respondent determining excessive profits against it. Sec. 403 (e) (1), Renegotiation Act of 1943.

The mandatory provision of the law relied upon by petitioner is that portion of section 403 (c) (1) which appears in the margin.[5] Petitioner interprets these provisions of the Renegotiation Act, when read in conjunction with the provisions of section 403 (c) (6), *supra*, to mean that respondent Board is required by the mandatory word "shall" to aggregate income, costs, and profits of the partnership and the corporation before respondent can determine that excessive profits were realized by the two businesses under common control. We can not follow petitioner's argument. Section 403 (c) (1), when read in conjunction with 403 (c) (6),[6] provides for the aggregating of amounts received or accrued on *all* contracts during the fiscal year of the contractor *or* subcontractor. This is the mandatory provision of which petitioner speaks. Congress, however, provided for an exception when it stated that amounts received or accrued under *one or more separate* contracts may be renegotiated separately at the request of the contractor or subcontractor. The size of petitioner's war contracts was such that there could be no renegotiation of one or more contracts separately. In any event, no such request was made here and we need not concern ourselves with the exception.

The mandatory provisions of section 403 (c) (1) are that respondent Board shall exercise its powers with respect to the aggregate of the amounts received or accrued during the fiscal year by a contractor, or that respondent Board shall exercise its powers with respect to etc., a subcontractor. The statute speaks in the disjunctive. It does not say the aggregate of the amounts received or accrued by a contractor *and* a subcontractor; it says the aggregate of the amounts received or accrued by a contractor *or* subcontractor. The statutory construction for which petitioner contends is not, in our opinion, well founded, and respondent is not required to consolidate income, costs, and profits of two enterprises under common control before it can determine whether either realized excessive profits on its war contracts.

Paragraph 310 of respondent's regulations for fiscal years ending after June 30, 1943, permits renegotiation on a consolidated basis with two or more business enterprises which are under common control as a result of common ownership in the discretion of the Department conducting the renegotiation and with the consent of the entities consolidated if, (a) such consolidation is reasonably necessary to protect

---

[5] * * * The Board shall exercise its powers with respect to the aggregate of the amounts received or accrued during the fiscal year (* * *) by a contractor or subcontractor under contracts with the Departments and subcontracts, and not separately with respect to amounts received or accrued under separate contracts with the Departments or subcontracts, except that the Board may exercise such powers separately with respect to amounts received or accrued by the contractor or subcontractor under any one or more separate contracts with the Departments or subcontracts at the request of the contractor or subcontractor. * * *

[6] Section 403 (c) (6) (footnote 3, *supra*) says: "This subsection shall be applicable to all contracts and subcontracts. * * *"

the interests of the Government, and (b) the renegotiation on consolidated basis is not inequitable to minority interests in one or more of the enterprises. Paragraph 311 of respondent's regulations provides for allocation of excessive profits in cases of consolidated renegotiation. Paragraph 312 provides as follows:

312. Where Consolidated Basis Not Used. Companies should not be consolidated for purposes of renegotiation unless they have the same fiscal year for Federal tax purposes and unless the parent-subsidiary relationship or common control existed for the entire fiscal period. Whenever parent and subsidiary companies are renegotiated not on a consolidated basis but separately, renegotiations with the individual members of the controlled group should be conducted concurrently if possible.

Petitioner's contention that the regulations are invalid and void is premised upon its interpretation of the mandatory provisions of 403 (c) (1), hereinbefore discussed. It is charged that respondent seeks to thwart the affirmative legislative intent by the simple expedient of promulgating a regulation. The fallacy of petitioner's argument lies in the basic premise. Respondent is not required by law to consolidate enterprises under common control in determining whether one of the enterprises realized excessive profits. Actually, the regulations protect contractors and subcontractors from being renegotiated on a consolidated basis by requiring their consent to the consolidation. Other conditions are also prescribed for renegotiation on a consolidated basis, so that the Government and any minority interest in one of the consolidated enterprises will be protected. The statute itself contains no provision requiring renegotiation on a consolidated basis. The regulations promulgated by respondent permit renegotiation on a consolidated basis only under certain conditions, which are designed to protect the interests of the several parties concerned. Regulations to the same effect existed under the Renegotiation Act of 1942, and if Congress had desired to change the administrative procedure in renegotiations on a consolidated basis, it undoubtedly would have provided therefor in the Renegotiation Act of 1943. We hold against petitioner on its contention that the regulations are invalid, void, and contrary to the statute.

The remaining question is the amount of excessive profits petitioner realized from its war contracts during the fiscal period. After a full and careful examination of the facts of record, we are convinced and have found that petitioner realized excessive profits in the amount determined by respondent. In so concluding, we have examined the items of insurance, depreciation, and expenses disallowed with respect to the personal car of Jean Warner Sprague and sustain respondent in his disallowance thereof. We have also considered and sustained respondent's disallowance of a salary of $5,000 to the limited partner,

who admittedly rendered no personal services to the partnership whatsoever. We reject petitioner's contention that this $5,000 item, denominated salary on the books, should be allowed as payment to Jean Warner Sprague for the use of or risking her capital in the business.

In determining a reasonable salary for the services rendered by Thomas W. Warner, Jr., we have considered the time devoted to the partnership and the time devoted to his other interests. Granting that he was in entire control of the partnership operations, it still appears from the uncontradicted testimony that he devoted only 10 per cent of his time to the partnership. Considering the gross sales, the net profits, and the time devoted to the business, a salary of $10,000 per annum for renegotiation purposes seems to be reasonable compensation, and we so hold.

Petitioner contends that additional costs should be allowed in determining its excessive profits. Included therein are a salary allowance of $20,000 to Thomas W. Warner, Jr., the $5,000 allowance to Jean Warner Sprague, heretofore considered, a rental payment of $14,688 for the small furnace, an interest item of $585, and a capital risk item of $48,309.90. The last three items were not paid out by the partnership, nor were liabilities therefor incurred; they simply represent charges which petitioner contends should be used to reduce its profits. Petitioner's accountant testified with respect to these various items and with respect to the depreciation disallowance by respondent. We have carefully examined the claimed additional costs and the reasons advanced for their allowance, but we are not convinced that they represent proper deductions in determining petitioner's excessive profits. The difference between the parties on the depreciation deduction allowable on machinery and equipment not covered by certificates of necessity is only $504.80, and results from a change in the rate by petitioner. The only justification advanced for the change was that a higher rate was used on the income tax return than the 10 per cent rate used by the respondent. We can not accept the accountant's testimony as proof of the proper rate to be used for depreciating petitioner's other machinery and equipment.

Considering the record before us and the statutory factors which must be taken into account in determining the amount of excessive profits realized by petitioner from its renegotiable contracts it is our opinion, and we have found, that petitioner had excessive profits during the 10-month fiscal period ended December 31, 1944, in the amount of $90,000 as determined by the respondent Board.

*An order will be entered in accordance herewith.*